c

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **ANDRAE D. AARON,**<br>**Plaintiff** | **CIVIL ACTION NO. 1:13-CV-02867;**<br>**SEC. P** |
| **VERSUS** | **CHIEF JUDGE DRELL** |
| **TIM KEITH, ET AL.,**<br>**Defendants** | **MAGISTRATE JUDGE PEREZ-MONTES** |

**REPORT AND RECOMMENDATION**

On October 15, 2013, *pro se* prisoner Andrae D. Aaron ("Aaron") filed a complaint pursuant to 42 U.S.C. § 1983. Aaron is an inmate in the custody of the Louisiana Department of Corrections ("LA DOC"). Aaron was incarcerated at Winn Correctional Center ("WCC") in Winnfield, Louisiana at the time he filed his complaint. Aaron contends that Defendants violated his constitutional rights by failing to protect him from harm inflicted by another inmate, and for failing to provide him with timely and adequate medical care following the attack. He additionally alleges that CCA has a policy of keeping "mental health" inmates separate from the general population, but they deliberately ignore the policy. He also alleges that WCC is understaffed.

In their Motion for Summary Judgment, Defendants contend that they were not aware of a potential attack on Aaron. They point out that although Aaron attached three inmate request forms to his Amended Complaint (Doc. 10, pp. 14-16), those forms were not date stamped. Date stamps would have been an indication that the forms were received. However, in addition to those forms not being date stamped,

no copies of those forms exist in the inmate files, and in his ARP, Aaron never indicated that he had filed those requests. Defendants further state that Aaron received medical treatment when his injuries were discovered the morning of the alleged attack and that none of Defendants were deliberately indifferent to his medical needs. Defendants further contend that Aaron has not produced any evidence that WCC was understaffed, and cannot show a violation of his constitutional rights by Defendants in this regard.

Aaron filed an Opposition to Defendant's Joint Motion for Summary Judgment (styled as Objections to Defendants Motion for Summary Judgment) and simultaneously requested leave to file a supplemental due to an issue receiving mail. (Doc. 57). Aaron relies on an article by Shane Bauer in Mother Jones magazine, an article from the Baton Rouge Advocate reporting on the Bauer article, and a report from the Department of Justice, to argue that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." (Doc. 57). However, any all references to the Mother Jones article and the Baton Rouge Advocate article were stricken from the record. (See docs. 73, 78).

## I. Background

Aaron alleges that he was attacked by inmate Marcus Dorsey ("Dorsey"), while in his cell at WCC, despite informing officials of the danger.

On August 1, 2013, Aaron states he had submitted a written notice and warning to Warden Keith, informing him that Dorsey had threatened Aaron. Aaron

states he asked that either he or Dorsey be moved out of the tier to avoid Aaron being harmed. (Doc. 10, p. 14).

On August 10, 2013, Aaron states that he had submitted a request to Assistant Warden Walker after receiving no response from Warden Keith. (Doc. 10, p. 15).

On August 11, 2013, Aaron states that he submitted a request to Assistant Warden Pollack, advising him that he had written to Warden Keith and Assistant Warden Walker, and telling him that Dorsey was going to harm him. Aaron advised that Dorsey was assigned to the bed next to his. Aaron states that he received no response from Assistant Warden Pollack, either. (Doc. 10, p. 16).

On August 20, 2013, at around 6:53 a.m., Dorsey used a microwave to heat water, which Dorsey poured on Aaron as Aaron slept. (Doc. 15-2, p. 11/45). Dorsey then beat Aaron with a sock filled with combination locks. The incident was reported at approximately 8:28 a.m. (Id.). Medical staff was alerted via radio at 8:30 A.M. and arrived in the unit at approximately 8:36 a.m. (Id.). Aaron was evaluated at the infirmary before being transported to Winn Parish Medical Center for further evaluation at approximately 9:49 a.m. (Doc. 15-1, p. 121/309). He was diagnosed with burns and prescribed Lortab for pain, recommended Silvadene dressings daily, and was instructed to watch for infection. (Doc. 15-1, p. 126/309). Aaron returned to WCC at approximately 11:50 a.m. that day and admitted to ISO cell #1 for daily dressing changes and pain management. (Doc. 15-1, p. 120/309). Aaron remained there until September 17, 2013, and continued to receive follow-up treatment for his injuries until September 23, 2013. (Doc. 15-1, pp. 279-309/309). Aaron states that he also

suffered from nightmares and had to seek mental health care as a result of the attack. (Doc. 10, p. 6).

Aaron filed an Administrative Remedy Procedure ("ARP") form. (Doc. 15-2, pp. 3-6/45). In that form, he stated that he was attacked and injured by Dorsey around 6:40 a.m. on August 20, 2013. He further stated that it was a direct result of a lack of security and staff not performing their duties. He asked that "[a]ll evidence including but not limited to, pictures, video surveillance, reports, logbooks, medical records, mental health notes and incident statement concerning this incident be preserved," but there was no statement asking for inmate request forms to be preserved. (Doc. 15-1, p. 6/45). Even assuming that those forms were inadvertently forgotten during the above request, there was no allegation anywhere in the ARP that he had advised Warden Keith, Tim Pollock, Nicole Walker, or any other offer that he felt unsafe being housed in the same tier with Dorsey.

## II. Law and Analysis

### A. Standards governing the Motion for Summary Judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;

> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> (4) issue any other appropriate order.[1]

"A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Hefren v. McDermott, Inc., 820 F.3d 767, 771 (5th Cir. 2016) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the non-movant. Dillon v. Rogers, 596 F.3d 260, 266 (5th Cir. 2010). However, a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

**B. Failure to protect.**

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 511 U.S. 825, 833 (1994); see also Johnston v. Lucas, 786 F.2d 1254, 1259 (5th Cir. 1986). "A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious" and the "prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities." Second, "a prison official must have a sufficiently culpable state of mind," i.e. deliberate indifference to a prisoner's constitutional rights, to be

[1] Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted unless the opposing party controverts those facts.

subjected to § 1983 liability to that prisoner. Farmer, 511 U.S. at 834. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. at 838.

Therefore, to establish an Eighth Amendment "failure to protect" claim, the inmate must show that the prison official acted or failed to act despite his knowledge of a substantial risk of serious harm. Id. at 842.

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

Id. at 843 (internal quotations omitted).

The failure of a prisoner to give any advance notice to prison officials of potential danger to the prisoner's safety is not dispositive of the official's awareness. Id. at 848. Nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite. Id. at 849, n. 10. On the other hand, prison officials may show that they were unaware of an obvious risk to inmate's health or safety, or

that, although they actually knew of the risk, they "believed (albeit unsoundly) that the risk to which the facts gave rise was unsubstantial or non-existent," or that they responded reasonably to a substantial risk even if the harm ultimately was not averted. Id. at 844. "Prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 845.

Aaron quotes Farmer to argue that the Baton Rouge Advocate article, the Baeur article, and the DOJ report indicate that a substantial risk of inmate attacks was "longstanding, pervasive, well-document, or expressly noted by prison officials in the past." Even if the Baton Rouge Advocate article and the Baeur article were admissible, Defendants still had to have been exposed to the information:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Farmer v. Brennan, 511 U.S. at 842-43 (internal quotations omitted).

Therefore, there must be some evidence in the record in that Defendants had been exposed to the information from the articles and actually knew of the risk in order for this language to have effect. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 528 (5th Cir. 1999) (plaintiff contending that defendant "must have" known of past problems relating to prisoners' medical care due to a consent decree being in place, but plaintiff did not proffer any evidence defendant was aware of the consent

decree). However, Aaron has not submitted any credible evidence that Defendants were aware of this information or the risk.

In his Amended Complaint, Aaron attached three inmate request forms that he contends he submitted prior to the attack by Dorsey as proof that he advised Defendants of a possible pending attack. (Doc. 10). The specific procedures to handle an Inmate Request Form are noted in the affidavits submitted by Defendants. The forms are date stamped when received by staff at WCC. (Doc. 44, pp. 31-39/46, Exh. A, B, C). Following a written response from Defendants, the original form would be returned to the inmate while a copy would go in the inmate's Master Prison File. (Id.). However, as Defendants noted in their Motion for Summary Judgment, the forms are not date stamped, nor are there written comments in the section reserved for staff response. Nor are there copies in the Master Prison File. (Doc. 44, pp. 43-44, Exh. E). Additionally, Aaron's ARP did not mention that Aaron had advised Defendants or any other officers that he felt unsafe around Dorsey, or that threats had been made. Furthermore, Defendants have submitted affidavits stating that none of them had ever been advised by either inmate of a problem between them. (Doc. 44, pp. 31-39/46, Exh. A, B, C).

In lieu of responding to Defendants' evidence regarding the inmate request forms, Aaron instead chooses to respond by arguing that the newspaper articles are sufficient evidence to prove the officials were subjectively aware of a risk to inmate safety. Yet, those newspapers are not proper summary judgment evidence, nor do they offer any evidence that Defendants were actually aware of the risk to Aaron.

Therefore, Aaron has not offered any proof that any of the Defendants were actually aware of the situation between Aaron and Dorsey. Since Aaron cannot show that there was a known risk, Defendants cannot be shown to have deliberately ignored that risk.

Additionally, in his opposition, Aaron argues that Defendants failed to protect him, citing to lack of overall security. Aaron specifically states that security cameras throughout the jail do not work. As an example, he states that he had requested video of the incident from Defendants, "which they never produced, obviously, much due to the faulty cameras not working." (Doc. 79, p. 2/286). The Court had received a letter from Aaron regarding the CD-ROM of the video being lost before he could view it. (Doc. 55). Following a telephone conference, Defendants were ordered to provide Aaron a replacement copy of the video and other materials by September 26, 2016. (Doc. 54). In response to Aaron's assertion in his opposition, Defendants show that a replacement copy was sent. (Doc. 75). Additionally, a Notice of Compliance was filed with this Court on September 26, 2016 (Doc. 56), and a letter from an official at Elayn Hunt Correctional Center stated that Aaron had viewed the video. (Doc. 75, Exh. B).

Aaron has not shown that any of the named Defendants were aware prior to the incident that he was at risk from attack by Dorsey. Therefore, Aaron has not shown that Defendants knew of a substantial risk of serious harm to Aaron and disregarded that risk by failing to take reasonable measures to abate it.

C. Denial of medical care.

Aaron claims Defendants were deliberately indifferent to his medical needs following the attack by Dorsey. Aaron is a convicted inmate. Therefore, his claim for inadequate medical care is analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To prevail, a plaintiff must establish that the response to a prisoner's medical needs was sufficiently harmful to evidence deliberate indifference. See id. Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. See Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997). It occurs when a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 837-40 (1994). Furthermore, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." Thompson v. Upshur County, Tx., 245 F.3d 447, 459 (5th Cir. 2001).

The Court must balance the needs of prisoners against the needs of the penal institution in light of medical necessity, not desirability. Woodall v. Foti, 648 F.2d 268, 272 (5th Cir. 1981). The fact that a plaintiff does not believe his medical treatment is as good as it should be is not a cognizable complaint. Prisoners are not constitutionally entitled to the best medical care that money can buy. See Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992). Disagreement with the medical treatment does not state a constitutional claim for indifference to medical needs.

Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997); see also Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).

Aaron was attacked by Dorsey at approximately 6:53 a.m. on August 20, 2013. (Doc. 15-2, p. 11/45). At 8:28 a.m., a correctional officer informed Counselor Marcus Hayes ("Hayes") of a man down in C1 tier. (Id.). Hayes entered and found Aaron sitting on his bunk with burns to his arms and upper body. (Id.). Within two minutes, Hayes had informed the Key Officer to notify medical. (Id.). Over the next ten minutes, LPN Mary Fobbs had arrived with a wheelchair and took Aaron to the medical center. (Id.). At 9:00 a.m., the Facility Emergency Flow Sheet detailed the medical staff's assessment of Aaron: no bleeding, large knot on left side of his head, skin sluggish off of shoulder, multiple blisters noted on his upper body. (Doc. 15-1, p. 128/309). The plan involved giving Aaron Torodol, a tetanus shot, and sending him to the emergency department at Winn Parish Medical Center ("WPMC"). (Doc. 15-1, p. 121/309). Aaron was at WPMC by 9:49 a.m. and discharged at 11:20 a.m. (Doc. 15-1, pp. 119. 126, 195-97/309). WPMC had discharged Aaron with instructions to take Lortab as needed for pain, to apply Silvadene dressings daily, and to watch for signs of infection. (Doc. 15-1, pp. 195-97/309). Aaron was admitted to ISO cell #1 for daily dressing changes and pain management. (Doc. 15-1, p. 119-120/309).

Aaron remained in the ward at WCC from August 20 through September 17, 2013. (Doc. 15-1, p. 279-309). Medical records indicate that he was monitored and treated daily. (Id.). Aaron made a sick call on September 19, 2013 regarding a cut on the burned area. Aaron was examined and found with no signs of bleeding or

infection, and given instructions before being released. (Doc. 15-1, pp. 122-25/309). He received additional follow-up treatment for the burns on September 23, 2013. (Doc. 15-1, pp. 119-20/309).

Aaron does not dispute that he was sent to the hospital, but instead argues that he was not cared for upon return to WCC from the hospital. (Doc. 79). Aaron states that he was not given the Lortabs when he requested it, and that he was forced to dress his own wounds. (Doc. 79). Aaron does not mention in his Complaint or Amended Complaint that he was not provided pain medication, nor did he file an ARP regarding a denial of pain medication. Additionally, Aaron does not point to evidence in the record regarding his not receiving pain medication, instead relying on the newspaper articles and letters to Secretary LeBlanc, none of which address Aaron's situation or Defendants. Aaron's medical records instead indicate that Aaron received pain medication and dressing changes following the attack. (See doc. 15-1, pp. 56-58, 283-309/309). There is no evidence that Defendants were deliberately indifferent to Aaron's medical needs.

**D. Under-staffing at WCC.**

In his Complaint, Aaron claims that WCC is under-staffed and that the under-staffing contributed to his injuries. (Doc. 10, p. 9).

"Mere understaffing, without more, is not proof of an official policy." Gagne v. City of Galveston, 671 F.Supp. 1130, 1135 (S.D. TX. 1987), aff'd 851 F.2d 359 (5th Cir. 1988). "Evidence of understaffing would become proof of an official policy only if more complete funding and staffing were possible and it was the deliberate intent of

the policy-making official not to adequately fund and staff the jail." Id. at 1135. If officials are aware of the staffing problem but fail to take corrective action, and understaffing appears to have contributed to a violation of an inmate's Eighth Amendment rights, a causal link exists between that violation and the policy. Miles v. Wilkinson, No. Civ. CV-06-1079-A, 2007 WL 5023592, at *7 (W.D. La. Nov. 26, 2007); see also Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990) (citations omitted). Aaron would only have a claim if complete staffing were possible, the policy-making official deliberately intended not to adequately staff the jail, and that policy caused his injury. See id. (citing Anderson v. City of Atlanta, 778 F.2d 678, 687 (11th Cir. 1985)).

Defendants show in an affidavit attached to their Motion for Summary Judgment that the staffing pattern at WCC was done in conjunction with the LA DOC. (Doc. 44, p. 33/46). The Management Services Contract includes a staffing pattern that is specifically approved by the LA DOC. (Id.). Warden Keith did not have the authority to change that staffing pattern without permission from the LA DOC (id.), and Aaron has not provided any evidence showing that there was an issue regarding deliberate understaffing at WCC.

Aaron attached a report from the Office of the Inspector General with the U.S. Department of Justice ("DOJ") entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("DOJ report"). (Doc. 79, p. 203-286). The DOJ report addressed facilities within the Federal Bureau of Prisons ("BOP"), in order to examine

how the BOP monitors the facilities. As the study examined federal prisons, not state prisons, none of the prisons studied included WCC.

In addition, Aaron also attached letters between the LA DOC and CCA to his Opposition to Defendants' Motion for Summary Judgment. (Doc. 79). The WCC letter from January 20, 2015, did discuss turnover rates, and noted that staff members had been temporarily assigned from other CCA locations to supplement the facility staffing. The letter noted that 31 temporary duty employees had been assigned to the facility. (Doc. 79, pp. 17, 20/286). In addition, the letter stated that pay had been increased to assist with retention rates, and a referral bonus had been implemented. (Id.). Although Aaron argues that the March 20, 2015 letter shows that Defendants were understaffed by 48 security positions (Doc. 79, p. 6/286), that same letter, which provided a status update on the situation, noted that there were 26 uniformed temporary duty employees assigned to the facility, with a total of 24 temporary duty SORT staff on site. (Doc. 79, p. 23/286). Additionally, the letter notes that pay increases had been implemented, as well as a referral bonus. Also, seven correctional officers were in pre-service class, and three additional employment offers had been accepted. (Id.).

Aaron has not provided evidence that there was an official policy of understaffing. Aaron has failed to draw a link from the DOJ report on federal prison monitoring to understaffing at WCC. Additionally, although Aaron argues that the letters between the LA DOC and CCA are evidence of understaffing, he needed to have shown that the officials were aware of the staffing problem and failed to take

corrective action. The letters show just the opposite: that CCA had brought in temporary duty employees and were attempting to improve work conditions in order to attract and retain staff. Therefore, Aaron has only made conclusory allegations that there was a policy of understaffing WCC, and has failed to show a genuine issue as to this claim. As there are no genuine issues of material fact which preclude a summary judgment, Defendants' Motion for Summary Judgment should be granted on the issue of prison staffing.

**E. Respondeat Superior.**

The doctrine of *respondeat superior*, which makes an employer or supervisor vicariously liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. § 1983. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). Supervisory officials cannot be held liable for their subordinates' actions. Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that cause plaintiff's injuries. See Mouille v. City of Live Oak, Tex., 977 F. 2d 924, 929 (5th Cir. 1992), cert. den., 508 U.S. 951 (1993); Thompkins, 828 F.2d at 303-04. Additionally, a corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies. Monell v. Dept. of Soc. Serv., 436 U.S. 658, 694 (1978). The test is whether there is a policy, custom, or action by those who represent official policy that inflict injury actionable under § 1983. Id. at 694.

Aaron has failed to establish that there was any official policy or custom that was the force behind the alleged constitutional violation. Aaron refers to letters

between the LA DOC and CCA regarding the need for improvements, or areas in which contract requirements could be an issue. (Doc. 79, p. 13/286). In response, CCA detailed a plan of action addressing those concerns, including making security improvements, such as increasing the number of shakedowns throughout the week, and implementing a plan to address staff turnover rates. (Doc. 79, p. 16-17/286). The DOJ report reflected on BOP monitoring of private contract prisons within the federal system. (Doc. 79, p. 202/286). Aaron states that the evidence proves that Defendants were not personally involved in the events, but that they failed to properly train and supervise employees involved in the constitutional deprivation. (Doc. 79, p. 10/286).

Aaron has not offered any evidence that acts or omissions of Warden Keith or CCA, or any unconstitutional policies implemented by Warden Keith or CCA, have deprived him of his constitutional rights, as he cannot establish an underlying constitutional violation. Aaron may disagree with the medical treatment he received and may believe that Defendants' failed to protect him from attack, but the record is clear that they were not deliberately indifferent to his needs. Furthermore, the letters presented by Aaron indicate that officials were taking corrective action to improve conditions at WCC, as opposed to being deliberately indifferent to its prisoners needs. Since there are no genuine issues of material fact that would preclude a summary judgment in favor of CCA, Defendants' Motion for Summary Judgment should be granted in favor of Warden Keith and CCA.

## III. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. 44) be GRANTED, and that Plaintiff's claims against all Defendants be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 17th day of February, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge